Carol L. Springman AUSTIN, Plaintiff,

v.

**CUNA MUTUAL INSURANCE SOCIETY
and CUNA Mutual Group,
Defendants.**

No. 05–C–692–C.

United States District Court,
W.D. Wisconsin.

Oct. 27, 2006.

Thomas R. Crone, Melli, Walker, Pease & Ruhly, S.C., Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201–219. Plaintiff Carol Springman Austin, a former employee of defendant CUNA Mutual Insurance Society, contends that defendants violated the Act by failing to pay her overtime compensation for work she performed between 2002 and 2004. Jurisdiction is present. 28 U.S.C. §§ 1331.

Originally, plaintiff proposed to litigate this lawsuit on behalf of herself and other current and former employees of defendant who were similarly situated to her. In orders dated November 29, 2005 and January 26, 2006, I granted plaintiff's motion for court facilitation of notice to 32 individuals who were identified as potential class members. On March 6, 2006, plaintiff informed the court that none of the individuals to whom notice was mailed opted to join her lawsuit. Consequently, she is proceeding in this case solely on her own behalf.

Now before the court is defendants CUNA Mutual Insurance Society's and CUNA Mutual Group's motion for summary judgment, in which defendants contend that plaintiff was not entitled to overtime compensation because she was "employed in a bona fide ... administrative ... capacity." 29 U.S.C. § 213(a)(1). Under the Act, an "employee employed in a bona fide administrative capacity" is any employee (1) who is compensated on a salary or fee basis at a [specified] rate ...; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.

The parties agree that plaintiff was paid a weekly salary in excess of the required amount. Moreover, despite plaintiff's assertions to the contrary, the work she performed was directly related to the management or general business operations of defendant and its customers. Finally, although the parties dispute the degree to which plaintiff exercised discretion and independent judgment, it is undisputed that she did make independent decisions periodically and was authorized to do so. Because plaintiff's job meets the requirement for administrative exemption under § 213(a)(1), defendants' motion will be granted.

Before turning to the undisputed facts, I note that plaintiff has moved to strike the

affidavits of James J. McCoy, Janet A. Van Blarcom, Timothy J. McCaffery, Stephen L. Baskind, Carleton R. Burch, Thomas R. Bowen and James M. Nolan, all submitted by defendants in support of their motion for summary judgment. In addition, plaintiff has filed a "Motion to Strike Certain of Defendants' Proposed Findings of Fact," dkt. # 63. In each of these motions, plaintiff asserts that the court should strike defendants' affidavits and the proposed facts that rely on them because the affiants lack foundation for their averments.

■ Rule 12(f) of the Federal Rules of Civil Procedure authorizes a court to strike from any pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, no rule authorizes a court to strike an affidavit on the ground that the affiant lacks foundation for his averments. If plaintiff wished to call into question the admissibility of the allegedly faulty affidavits, her remedy was not to strike the affidavits themselves, but to dispute each of the facts proposed by defendants that relied on those affidavits, on the ground that the proposed facts were not supported by admissible evidence. *Procedure to be Followed on Motions for Summary Judgment,* I.C.1. ("[E]ach proposed finding must be supported by admissible evidence.").

In determining which facts are disputed, I have taken into consideration the challenges plaintiff has raised to the admissibility of the affidavits of James J. McCoy, Janet A. Van Blarcom, Timothy J. McCaffery, Stephen L. Baskind, Carleton R. Burch, Thomas R. Bowen and James M. Nolan. However, plaintiff's motions to strike will be denied as unnecessary.

■ One last preliminary matter needs to be addressed. On October 18, 2006, plaintiff filed a motion asking the court not to consider documents defendants filed in reply to their motion for summary judgment. *See* dkt. # 82. As a ground for her request, plaintiff asserted that the documents were untimely because they were submitted on Tuesday, October 10 and in the early morning hours of Wednesday, October 11, instead of on Monday, October 9, which happened to be a federal holiday. The preliminary pretrial conference order does not indicate specifically whether a brief must be submitted if it falls due on a day when the court is closed. Instead, the order states the following:

> All responses to dispositive motions must be filed and served within 21 calendar days of service of the motion, which the court presumes is the date the motion is filed with the court. Any reply by the movant must be filed and served within 10 calendar days of service of the response ... A party is not entitled to additional time under Rule 6(a) or 6(e) to file and serve documents related to a dispositive motion.

Dkt. # 23 at 2–3. Because the order requires a moving party to count weekends and holidays toward its 10–day reply period, plaintiff assumes that defendants' reply materials were untimely filed. Although plaintiff's reading of the preliminary pretrial conference order is understandable, her reading is stricter than this court intended it to be. *See, e.g.,* dkt. # 23 at 6 (with respect to discovery deadlines, "in the event that the [deadline] falls on a weekend, the response is due by noon on the next day the court is open"). To avoid future confusion, let me be clear: When a party is briefing a dispositive motion and the deadline for responding or replying to that motion falls on day the court is closed, the documents may be filed on the next business day. Consequently, the documents defendant filed on October 10 were timely. Although the documents filed on October 11 were technically late, each was filed by 12:18 a.m. Defendants' brief tardiness with respect to those documents will be forgiven; plaintiff's motion to strike will be denied.

From the parties' proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Carol L. Springman Austin is an adult resident of Wisconsin. She holds a bachelor's degree in legal assistance and criminal justice, and has worked for more

than twenty-five years as a paralegal, legal specialist and legal assistant with a variety of companies and organizations.

Defendant CUNA Mutual Insurance Society is a financial services provider that offers life, accident and health insurance to policyholders, most of whom are credit unions and their members. Defendant CUNA Mutual Insurance Society is the parent organization of all member companies that together form defendant CUNA Mutual Group. (Because defendant CUNA Mutual group is not an incorporated or organized legal entity, but rather is an unregistered umbrella trade name for numerous companies affiliated with defendant CUNA Mutual Insurance Society, all references to defendant in this opinion will be to defendant CUNA Mutual Insurance Society.)

B. *Plaintiff's Employment with Defendant*

1. *Job Titles*

On July 17, 2000, plaintiff was hired by defendant to work as a "Law Specialist II." To qualify for the position, an applicant needed a general college degree, a paralegal education or equivalent experience. Plaintiff had a degree in paralegal studies. At the time she was hired, there were four levels of Law Specialists within the Office of General Counsel: Law Specialist I, Law Specialist II, Law Specialist III, and Senior Law Specialist. Plaintiff worked as a Law Specialist II from July 17, 2000 until November 17, 2003.

As a Law Specialist II, plaintiff worked as a member of the litigation team in defendant's Office of General Counsel. The litigation team managed third-party litigation

cases brought against members of the credit unions that defendant insured.

Beginning November 17, 2003, defendant reduced the four levels of law specialist titles to two: Law Specialist I and Senior Law Specialist. Plaintiff was reclassified as a Law Specialist I. She worked as a Law Specialist I from November 17, 2003 until August 23, 2004.

At the time the law specialist positions were restructured, defendant's human resources department put together a handout titled "Frequently Asked Questions," which explained the reorganization:

Why are there only two levels for law specialists?

Our previous descriptions include multiple levels for law specialists. We found that there wasn't clear distinction among the multiple levels. Our new two levels are clearly differentiated based on the level of judgment required and the scope of decisions being made. Remember the Career Tier for each level is now much broader and extends over considerably more than the current grade structure.

On August 23, 2004, the law specialist positions were restructured again. This time, plaintiff's job title was changed from Law Specialist I to Law Specialist–Case Managers. Plaintiff's job title remained Law Specialist–Case Managers until her last day of employment on December 30, 2004. The job descriptions for the Law Specialist I and Law Specialist–Case Managers positions differed in the following ways:

| Law Specialist I | Law Specialist–Case Managers |
|---|---|
| This job family consists of two levels of law specialists/paralegals assigned to the Legal Division. The two levels are distinguished by the: | This job family consists of two levels of law specialists/paralegals assigned to the Legal Division. The two levels are distinguished by the: |
| -degree of proficiency within a defined legal speciality or process | -degree of proficiency within a defined legal speciality or process |
| -complexity of assigned projects | -complexity of assigned projects |
| -degree of supervision under which work is completed. | -degree of supervision under which work is completed. |
| | Specific responsibilities vary depending on the specialty or process of the attorney(s) to whom they report. |

| | |
|---|---|
| The Law Specialist I provides legal assistance in more routine or more standard legal issues and transactions, under the direction and guidance of supervising attorney(s) or managing law specialist. | The Law Specialist–Case Manager is responsible for handling matters arising out of litigation. This position guides Outside Counsel into making appropriate decisions by managing to the CUNA Mutual Litigation Philosophy, under the direction and guidance of a supervising attorney(s) or managing law specialist. |
| Examples of responsibilities include directing retained counsel in assigned lawsuits, communicating advice, monitoring compliance with federal and state laws and regulations, identifying legal issues, doing legal research, preparing and presenting educational seminars, preparing corporate governance related documents, preparing holding company reports and filings and preparing other legal documents. | Examples of responsibilities include directing retained counsel in assigned lawsuits, communicating advice, monitoring compliance with federal and state laws and regulations, identifying legal issues, doing legal research, preparing and presenting educational seminars, and preparing other legal documents. |

| JOB RESPONSIBILITIES | JOB RESPONSIBILITIES |
|---|---|
| 1. Build and maintain positive internal and external customer relationships. | 1. Build and maintain positive internal and external customer relationships. |
| 2. Support the design of highly efficient processes. | 2. Support the design of highly efficient processes. |
| 3. Draft and analyze legal documents. | 3. Draft and analyze legal documents. |
| 4. Conduct legal research. | 4. Conduct legal research. |
| 5. Provide compliance assistance. | 5. Accountability for matching case results to the Litigation Philosophy. |
| 6. Build external relationships with service providers, outside counsel and others as required by job duties. | 6. Build external relationships with service providers, outside counsel and others as required by job duties. |
| 7. Understand and support the Legal Division strategy and future vision. | 7. Understand and support the Legal Division strategy, as well as the Litigation strategy, and future vision. |
| | 8. Provide communication to key customers with respect to risk management and loss control. |

Law Specialist–Case Managers were expected to evaluate independently each claim assigned to them and to challenge and question recommendations of counsel when they deemed it appropriate. Law Specialist I's were paid overtime; Law Specialist–Case Managers were not.

During the entire time plaintiff worked for defendant, she received a salary and was not paid overtime compensation during weeks in which she worked more than 40 hours. At the time plaintiff was hired, she received a salary of $46,000 annually. By August 23, 2004, plaintiff earned $51,000 annually. During 2002 and 2003, plaintiff worked approximately 45–50 hours each week. During 2004, she worked 55–60 hours each week.

*2. Job duties*

Although plaintiff's formal title changed several times, most of her duties remained the same throughout her employment with defendant. At any given time, plaintiff had a caseload of more than 100 cases. She was authorized to spend up to $50,000 to settle each of the cases assigned to her. Routinely, she settled matters for less than $30,000 without consulting her supervisors.

During plaintiff's employment with defendant, all litigation matters involving defendant, its affiliates and its insured customers were managed by members of the legal division's litigation team, of which plaintiff was a member. Plaintiff's primary job responsibility consisted of handling third-party lawsuits submitted by defendant's credit union policy-

holders covered under the policyholders' CUNA insurance policies. Plaintiff managed a variety of cases, including some that were considered complex.

In managing a case, the litigation team followed the same basic process. First, when a policyholder was sued by a third party, one of its representatives would contact defendant to find out whether the lawsuit was covered under its policy. A secretary or administrative assistant employed by defendant would gather the basic information provided by the policyholder (such as the customer number, types of policies that the customer held, and a copy of the complaint) and present the information to a lawyer or to the managing law specialist, who would determined whether the claim was covered. The lawyer or managing law specialist would note the coverage decision on an intake sheet and assign the case to one of the law specialists, such as plaintiff. (Throughout her employment with defendant, plaintiff did not make any final determination regarding whether coverage was available for any particular claim.)

When plaintiff was assigned a case, first she would enter data from the intake sheet and other case documents into a central database. If her supervisor had determined that there was no coverage for a particular case, plaintiff would contact the credit union and inform them that coverage had been denied. If the credit union protested the decision, plaintiff would consult with her supervisor. If the supervisor denied coverage again, plaintiff would write to the credit union informing it of the final decision.

When a decision was made to cover the claim, whether in the first instance or after reconsideration, plaintiff established a reserve amount (the maximum estimated value of the case) by entering an amount in the central database. Sometimes, her supervisor would suggest a reserve amount; other times, plaintiff set the amount herself. Plaintiff was authorized to set the reserve for any case at an amount up to $50,000. On occasion, plaintiff was given the authority to settle claims for more than $50,000.00, though she needed her supervisor's pre-approval to do so.

After setting the reserve amount, plaintiff would secure outside counsel to represent the insured in the litigation. Sometimes her supervisor would suggest particular outside counsel; when he did not, plaintiff followed procedures for obtaining outside counsel by selecting a lawyer from a list in the central database.

Once counsel had been selected, plaintiff would contact the credit union and inform it of the level and type of coverage that were available, relying on information the in-house lawyer had noted on the intake form, and would provide the credit union with the name and contact information of the outside counsel who would be handling the case.

Next, plaintiff would draft and send retainer letters to outside counsel that included a summary of the complaint or the incident that had led to the claim. Then, plaintiff would chart the progress of the case by talking to outside counsel about the manner in which the litigation was progressing. She worked with counsel to insure that the case was being handled efficiently and was moving to resolution. In addition, plaintiff would perform legal and factual research related to the claims assigned to her. She provided these findings to outside counsel. Throughout the course of the case, plaintiff would record information relating to the case in the Notes field of the database.

In approximately 60% of the cases plaintiff handled, outside counsel secured dismissal of the case before trial. Once outside counsel informed plaintiff that a case had been dismissed, she followed prescribed procedures for closing out the file in the central database. When outside counsel called and advised plaintiff that a case could be settled for a nominal amount, she would authorize the settlement and record the settlement information. When a settlement agreement required a signature from defendant or any of its affiliates, plaintiff was required to have an officer of defendant or the affiliate to sign the agreement. Plaintiff did not have the authority to sign a settlement agreement on behalf of defendant or any of its affiliates.

If a case was not dismissed or did not settle for a nominal amount, the case occa-

sionally went to mediation. Before mediation, it was common practice for outside counsel to contact plaintiff and give her a recommendation for settlement. If the recommended amount needed to settle the claim neared $30,000 or exceeded plaintiff's authority for setting reserves of $50,000, it was her practice to consult with a supervisor before authorizing the release, though she was not required to do so unless the settlement amount exceeded $50,000.

On one occasion, a case went to mediation shortly after it was transferred to plaintiff. During the mediation, outside counsel contacted plaintiff and recommended that she authorize him to accept a $50,000 settlement offer. Being unfamiliar with the case, plaintiff asked outside counsel to tell her about the litigant. At the same time, she searched for the litigant's name on the internet, where she discovered unfavorable information about him. Plaintiff relayed to outside counsel what she had found. Approximately ten minutes later, outside counsel called back and told plaintiff that the litigant was willing to settle his claim for $10,000.

Plaintiff never attended any mediation sessions in person; however, she was available by phone in the event that outside counsel needed to contact her to obtain authorization for a higher settlement amount. The vast majority of the time, the case settled for an amount within the reserve range plaintiff had set initially. In these cases, outside counsel would inform plaintiff of the settlement after the mediation ended.

Only one of plaintiff's major cases ever went to trial. That case involved a $1500 forged check from a credit union in a rural county of Alabama and was handled by outside counsel, James Nolan. In conversations with plaintiff, Nolan told plaintiff that the credit union had a strong defense against the claim and that, under the Uniform Commercial Code, damages against the credit union would be limited to $1500 should the jury return a verdict against the credit union. Plaintiff knew that the credit union did not want to settle the case and therefore did not authorize settlement. At trial, the jury returned a $1.7 million verdict against the credit union.

Occasionally, when plaintiff reviewed a bill submitted by outside counsel, she would notice an error such as double billing. In these cases, she would contact outside counsel, who either explained the bill or resolved the problem. Otherwise, plaintiff showed any bill that appeared unusual to her supervisor, who told her how to handle the matter.

During her employment, plaintiff never inspected any property, prepared damage estimates, testified on behalf of defendant or an insured or contacted or negotiated directly with opposing counsel or a third-party litigant to resolve a suit. Neither she nor any of the other law specialists on the litigation team were licensed as claims adjusters.

Because of plaintiff's paralegal training, she has strong skills as a legal and factual researcher. While plaintiff was a law specialist, a number of lawyers in the legal division gave her research projects to complete. She performed research using Westlaw, LEXIS and internet search engines. In addition, she performed research in person at the University of Wisconsin and Wisconsin State Law Libraries. Occasionally, plaintiff would volunteer to perform research on particular legal or factual issues or outside counsel would ask her for such help. On January 22, 2004, plaintiff received a work evaluation that stated in part:

> What behaviors have you observed that demonstrate this individual's strengths in the competencies above?
>
> Manager(s)-Carol does an excellent job of looking for that piece of information or legal basis that will assist in making the case the strongest it can be. She is a tireless researcher, and provides a skill that no one else in the litigation team provides. She has very good insight into legal issues and is experienced in applying that insight. Carol's skills make her a valuable employee. Carol has very strong analytical skills. She is called upon to do a great deal of legal research as this is something that she does very well.

### 3. *Increase in job duties*

In March 2004, plaintiff and other individuals in her department moved from de-

fendant's offices in Middleton, Wisconsin to defendant's headquarters in Madison, Wisconsin. Before moving to the Madison office, plaintiff had spent approximately 15–20 hours per week on research. Approximately five hours or less of that time was spent on research related to the cases she was monitoring; the remainder was spent on research projects assigned to plaintiff by members of the litigation team and legal department. When she moved to the Madison office, the amount of legal research plaintiff was assigned increased.

Around November 2003, plaintiff's job duties increased to include maintaining the litigation team's "Knowledge Management" database. To maintain the Knowledge Management database, plaintiff was required to read briefs from outside counsel and opinion letters from in-house lawyers, summarize the content of the brief or opinion letter and index the summary by topic so it could be found again if similar issues arose in later cases. Plaintiff maintained the Knowledge Management database from November 2003 until her departure in December 2004. Plaintiff spent approximately twenty hours each month maintaining the Knowledge Management database.

In November 2003, plaintiff began preparing report summaries for the Bond Eligibility Review Committee to use in reviewing appeals from credit union employees whose fidelity bonds had been revoked. Each month, plaintiff read each file and prepared a detailed summary of each pending case before the committee. Plaintiff spent approximately 35 hours monthly preparing the reports and attending the committee meeting.

Before July 2004, plaintiff and other litigation team law specialists and lawyers were supported by administrative assistants who were responsible for completing, mailing and faxing out coverage and retainer letters. In addition, the administrative assistants were responsible for linking electronic documents from the litigation team's electronic mailbox to the Notes field of the central database. Beginning in July 2004, plaintiff was required to complete these tasks herself without the support of an administrative assistant.

Plaintiff terminated her employment with defendant on December 30, 2004. In her exit interview statement, plaintiff wrote:

... I came to CMG in July 2000 with over 21 years of experience as a legal assistant in various business environments, including international corporations and national law firms. During my 4.5 years at CMG, I received very positive feedback for my professional contributions, especially my legal research abilities which I have always willingly shared with whoever required my assistance.

Because of my background and skills, I was able to offer my cases, my coworkers, our insureds and customers, including outside counsel, my experience and skills in order to bring value to my work and save money for CMG and our insureds. And, I did bring a lot of value to my work by finding case law and statutes that favorably effected the outcome of my cases, investigating the background of plaintiffs which resulted in discovering pertinent information which brought value to my cases, helping other case managers with similar information on their cases, etc. My point here, clearly, is that I was a very professional and conscientious employee, which is supported by my AIMS and 360 Feedback.

### 4. Job classification

Beginning in the fall of 2003, defendant undertook a company-wide effort to consolidate multiple salary grades to a more limited number of salary grades. This process was referred to as "broadbanding." The law specialist positions were some of the first to be restructured during the broadbanding process. During this process, the positions were reviewed with respect to their eligibility for exemption from the Fair Labor Standards Act.

During the time plaintiff was employed by defendant, Joanne Wanninger was the human resources employee authorized to determine whether defendant would classify law specialists as exempt or nonexempt from the Fair Labor Standards Act. In 1986 or 1987 Wanninger was certified (in what, the parties do not say). When the Department of Labor

updated the Fair Labor Standards Act regulations in 2004, Wanninger was trained on the Act's new provisions.

In spring 2004, Wanninger and a team of fourteen human resources employees conducted an internal audit as part of defendant's implementation of the new Department of Labor FLSA regulations. As part of the audit, defendant revisited the question of exemption. Wanninger consulted with a lawyer, who concluded that plaintiff's position was designated properly as exempt under the Act's administrative exemption. During this process, no one interviewed plaintiff or consulted her about the specific duties she performed or whether her position should be exempt.

### OPINION

The Fair Labor Standards Act requires employers to pay qualifying employees at least one and a half times their regular wage rate for hours worked in excess of forty hours each week. 29 U.S.C. § 207(a)(1); *Haywood v. North American Van Lines, Inc.,* 121 F.3d 1066, 1069 (7th Cir.1997). The Act exempts from these provisions "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Defendant contends that plaintiff was exempt from overtime compensation because she was employed in an administrative capacity.

 Because the administrative exemption is an affirmative defense, defendant bears the burden of establishing its application. *Piscione v. Ernst & Young, L.L.P.,* 171 F.3d 527, 533 (7th Cir.1999) (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). As a general matter, such exemptions are narrowly construed, *Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959), and applied only where they "plainly and unmistakably comes within the statute's terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

The Fair Labor Standards Act does not define "executive, administrative, or professional capacity;" instead, it expressly delegates that task to the Secretary of Labor who may "from time to time" alter the definitions of these terms. *Kennedy v. Commonwealth Edison Co.,* 410 F.3d 365, 369 (7th Cir.2005) (citing 29 U.S.C. § 213(a)(1)). Under that authority, the Secretary has promulgated different tests for evaluating whether an employee may qualify as an exempt administrative employee. *See, e.g., Haywood,* 121 F.3d at 1069 (7th Cir.1997) (summarizing "long" and "short" tests employed prior to August 23, 2004); *Kennedy,* 410 F.3d at 370 (summarizing new test employed on and after August 23, 2004).

Although the particular provisions governing exemption changed during the time plaintiff was employed by defendant, the parties agree that the test set forth in 29 C.F.R. § 541.200 governs plaintiff's claims in this case. Under § 541.200, plaintiff will be considered an exempt administrative employee if she was (1) compensated on a salary or fee basis at a [specified] rate ...; (2) her primary duty was the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) her primary duty included the exercise of discretion and independent judgment with respect to matters of significance. Because the parties do not dispute that plaintiff received a salary that exceeded the specified rate, I need address only the second two factors of the test.

### A. Work Related to the Management or Business Operations of the Employer

To qualify for exemption, an employee must "perform work directly related to assisting with the running or servicing of the business." *Id.* Work "directly related to management or general business operations" includes, but is not limited to:

work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; le-

gal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b). Employees who act as advisers or consultants to their employer's clients or customers perform work that is considered to be "directly related to management or general business operations." 29 C.F.R. § 541.201(c).

■ The first step in deciding whether an employee's primary duties are directly related to management or general business operations is to determine what the employee's primary duties are. "[I]t may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103. However, time alone is not the sole test. *Id.* A job duty that is of principal importance to the employer, or other duties that are collateral to that job duty, may be considered primary duties even though they occupy less than fifty percent of the employee's time. *Schaefer v. Indiana Michigan Power Co.,* 358 F.3d 394, 401 (6th Cir.2004); *Kohl v. Woodlands Fire Dept.,* 440 F.Supp.2d 626, 634 (S.D.Tex.2006) (citing *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1224 (5th Cir. 1990)). In determining what an employee does, the court looks at the actual day-to-day job activities of the employee, not the labels the employee or the employer places on those duties. 29 C.F.R. § 541.2; *Tyler v. Union Oil Co. of Calif.,* 304 F.3d 379, 404 (5th Cir.2002); *Schaefer,* 358 F.3d at 400; *Kohl,* 440 F.Supp.2d at 634. The court may consider general job descriptions as well as descriptions contained in deposition testimony and affidavits. *Schaefer,* 358 F.3d at 400–01.

■ In this case, it is undisputed that plaintiff performed a number of job tasks daily. At various times throughout her employment with defendant, she entered information into the central database, spoke to outside counsel, made notes of conversations she had with insureds and counsel, consulted with her supervisors, performed legal research relating directly to her cases and to other matters, performed various clerical tasks (such as faxing and linking documents electronically), set reserve amounts, authorized settlements and created report summaries. It is also undisputed that of these tasks, plaintiff's primary job responsibility was handling third-party lawsuits brought against defendant's policyholders and covered by the policies defendant issued them. At any given time, plaintiff was handling more than 100 such cases.

Rather inscrutably, plaintiff contends that her work was "simply too far removed from [defendant's] main business of providing financial services and products for it to be directly related to management policies or general operations of the employer or the employer's customer." Dkt. #49, at 9. In support of this position, she contends that because she did not "advise management, participate in planning the company's global business strategies or promote sales of its financial products and services" her work was "not of substantial importance" to the operation of defendant's business. *Id.* at 9– 10. However, nothing in the Act or its implementing regulations requires an employee to run a business herself; her work need only be "directly related to assisting with" the running or servicing of the business's operations. 29 C.F.R. § 541.201(a). That is why tasks such as "auditing, insurance, quality control, ... research, ... public relations and ... similar activities" are covered specifically under § 541.201(b). Defendant provided insurance policies to credit unions; plaintiff insured that those policies were honored. Plaintiff's work as a case manager on defendant's litigation team was related directly to defendant's general business operations.

### B. Exercise of Discretion and Independent Judgment

The next question is whether plaintiff's primary duty "included the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). When determining whether an employee exercises "discretion and independent judgment," the court must look at "all the facts

involved in the particular employment situation in which the question arises." *Id.* Factors to consider include whether the employee:

> has authority to formulate, affect, interpret, or implement management policies or operating practices; carries out major assignments in conducting the operations of the business; performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; has authority to commit the employer in matters that have significant financial impact; has authority to waive or deviate from established policies and procedures without prior approval; has authority to negotiate and bind the company on significant matters; provides consultation or expert advice to management; is involved in planning long- or short-term business objectives; investigates and resolves matters of significance on behalf of management; and represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

Although the exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision, the term "discretion and independent judgment" does not require that the decisions made by an employee be free from review or that the employee have unlimited authority. 29 C.F.R. § 541.202(c).

Plaintiff contends that she lacked discretion for several reasons: (1) she followed litigation department guidelines when setting an initial reserve amount for each claim she handled; (2) she performed clerical tasks, such as faxing, linking documents electronically and entering routine data into the central database; (3) she followed the advice of outside counsel and of her supervisors in all but the rarest circumstances; and (4) it was her understanding that she was supposed to "minimize conflicts with outside counsel's recommendations." Plaintiff emphasizes that

> the exercise of discretion and independent judgment must be more than the use of

skill in applying well-established techniques, procedures or specific standards described in manuals or other sources [and] does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work.

29 C.F.R. § 541.202(e).

In making this argument, plaintiff overlooks the fact that the regulations require the exercise of "discretion and independent judgment" only with respect to the employee's primary duties. Therefore, it does not matter that plaintiff spent a portion of her time engaged in clerical work and data entry because she does not dispute that these tasks fell outside her primary responsibility (time-consuming though they may have become). Plaintiff's primary duty was handling third-party lawsuits brought against defendant's policyholders. With respect to that duty, she *was* authorized to exercise discretion and to use independent judgment.

Plaintiff contends that she was trained to minimize conflicts with outside counsel because failure to do so could create a conflict of interest between defendant and its insureds. Defendant disputes that this is what plaintiff was taught to do, contending that the training to which she refers was meant to apply in only a small fraction of the cases she handled. Even if plaintiff was instructed to "act conservatively when dealing with outside counsel," as she alleges, she does not dispute that she retained the authority to act against counsel's directive when she deemed it appropriate to do so.

It is undisputed that plaintiff had authority to spend up to $50,000 to settle each of the cases assigned to her and that she routinely settled matters for less than $30,000 without consulting her supervisors. Although plaintiff makes much of the fact that she relied heavily on the recommendations of outside counsel and rarely deviated from counsel's recommendations regarding the value of her cases, it is undisputed that there were occasions (rare though they may have been) on which plaintiff rejected the assessment of counsel when it differed from her own. Plaintiff may have exercised her discretion

conservatively, but she does not deny that she had the authority to act independently and to exercise discretion in handling cases worth up to $50,000 when she chose to exercise it. *Cf. Guerrero v. J.W. Hutton, Inc.,* 458 F.3d 830, 832 (8th Cir.2006) (subrogation analyst whose "job required her to review client files and to make recommendations to her supervisors concerning potential settlement offers to close insurance claims" exercised independent judgment and discretion).

Because defendant has met its burden of proving that plaintiff meets the requirements for administrative exemption under 29 U.S.C. § 213(a)(1), the motion for summary judgment will be granted. Therefore, I need not address the parties' remaining arguments regarding the proper method for calculating plaintiff's alleged damages.

### ORDER

IT IS ORDERED that

1. Plaintiff Carol Springman Austin's motions to strike the affidavits of James J. McCoy, Janet A. Van Blarcom, Timothy J. McCaffery, Stephen L. Baskind, Carleton R. Burch, Thomas R. Bowen and James M. Nolan are DENIED as unnecessary.

2. Plaintiff's "Motion to Strike Certain of Defendants' Proposed Findings of Fact" is DENIED as unnecessary.

3. Plaintiff's "Motion Requesting That the Court Not Consider Certain Documents Filed in Movants' Reply to Plaintiff's Summary Judgment Submission" is DENIED.

4. The motion for summary judgment of defendants CUNA Mutual Insurance Society and CUNA Mutual Group is GRANTED. The clerk of court is directed to enter judgment in favor of defendant and close this case.