# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-2971

TERRY J. KENNEDY, *et al.*,

*Plaintiffs-Appellants*,

v.

COMMONWEALTH EDISON CO.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-C-4053—**Joe Billy McDade**, *Judge.*

_____

ARGUED APRIL 16, 2004—DECIDED JUNE 2, 2005

_____

Before EASTERBROOK, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Although the Fair Labor Standards Act (FLSA) guarantees overtime compensation for many workers, its protections do not extend to everyone. In this case, 55 employees of Commonwealth Edison ("ComEd") claim that ComEd classified them on the wrong side of the line—namely, as administrative employees who fall within an exemption to the FLSA's overtime promise. See 29 U.S.C. § 213(a)(1). In a series of rulings, the district court ultimately concluded that ComEd had met its burden of demonstrating for purposes of summary judgment that the employees were correctly classified, both for purposes of the FLSA and for

a closely related claim under the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/4a. The employees appealed, and we affirm.

## I

We begin with an introduction to the parties. The 55 plaintiffs are employed at five nuclear power plants now operated by Exelon Generation Company, LLC ("Exelon Generation"). Plaintiffs fall into five different groups: 42 are Work Planners; three are Lead Work Planners; four are First Line Supervisors; three are Supply Analysts; and three are Staff Specialists (two in the Engineering Department and one in the Chemistry Department). We save for later a more detailed discussion of what these jobs entailed.

The identity of the defendant, or defendants, caused us some trouble at oral argument. The caption of the case names only Commonwealth Edison Company, but the lawyer who appeared on ComEd's behalf listed himself as counsel with Exelon Business Services Company. This prompted us to ask what the relationship was between Exelon Business Services (obviously not an outside law firm) and ComEd, and whether ComEd was still a proper party in the case. The parties responded with post-argument briefs, in which they explained that ComEd is still a separate corporate entity, though now a subsidiary of Exelon Corporation ("Exelon"). ComEd is the only defendant ever served in this case and it has admitted that it employed the plaintiffs at the time the case began in May 2000. On October 20, 2000, ComEd's parent, Unicom Corporation, merged with Exelon, which is when ComEd became Exelon's subsidiary. Shortly after the merger, Exelon took a number of steps to restructure its businesses. As part of that process, ComEd transferred its five nuclear plants to Exelon Generation, a different wholly- owned subsidiary of Exelon. That transfer was effective January 1, 2001, at which time the plaintiffs'

employer changed from ComEd to Exelon Generation. ComEd itself, no longer in the power generation business, became a subsidiary of Exelon Energy Delivery Company, LLC, which is a wholly-owned subsidiary of Exelon. Yet another subsidiary of Exelon, Exelon Business Services Company ("Business Services") provides legal services (among other things) to the various members of the Exelon family. The parties dispute the significance of the fact that the plaintiffs never took steps formally to add Exelon Generation as a party defendant to the case. Plaintiffs argue that, given the way the litigation has proceeded, Exelon Generation is a *de facto* defendant, and that it would be a mere formality to add it as a party on remand; ComEd concedes that the case is alive against it for any salary claims before January 1, 2001, but it implies that plaintiffs have no claim against Exelon Generation. While it seems fairly clear that Business Services has been representing whichever member of the corporate family was the employer, we need not explore the intricacies of this situation in detail. Given our disposition of the merits, it can wait for another day.

Exelon proclaims on its website that it "operates the largest nuclear fleet in the United States, the third largest commercial nuclear fleet in the world, and is generating nuclear energy more efficiently than ever." See http://www.exeloncorp.com/corporate/about/a_overview.shtml. The five nuclear power plants at which the plaintiffs worked are part of that "fleet." Because their appeal turns on an appreciation of what exactly it was that they did for ComEd (and now for Exelon Generation), we must identify the duties and responsibilities of each position.

*Work Planners.* Forty-two of the plaintiffs held the job title of "Work Planner." Work Planners are essentially problem solvers. Whether in the electrical area, the mechanical area, or the instrument area, a Work Planner's primary duty is to prepare and create a "work package." If something at the plant needs to be repaired, if something needs

to be inspected, or if equipment needs to be modified, the Work Planner is responsible for devising the solution to the problem. He or she first studies the problem and decides what kind of labor, materials, and equipment will be needed for the project. The Planner may study a computer database to find out what has been done before on similar problems, to see what parts are available, and to review repair procedures. The Planner may also make a visual inspection of the problem area to verify the exact nature of the problem and to assess the situation personally. Once the Planner has written up the proposed work package, she submits it to another Work Planner for technical review. Further review after that step is also possible.

*Lead Work Planners.* Three of the plaintiffs held the title of "Lead Work Planner." These employees are essentially middlemen between the Planners and the higher-ups. They review the Planners' work packages, conduct spot-checks to make sure the Planners' work is adequate, and often write work packages themselves. Lead Planners must keep those working under them on task, conforming to a strict schedule dictated by ComEd's Work Control Department. To keep her group on schedule, the Lead Planner must assess the efficiency of various possible approaches and determine which Planner has the time and experience necessary to handle a particular assignment. The Lead Planner coordinates with other departments, anticipating and removing any roadblocks that could slow her team down. The Lead Planner also provides information to her supervisor, discussing the Planners' progress and assessing the feasibility of staying on schedule.

*First Line Supervisors.* Four plaintiffs held the title of "First Line Supervisor." These Supervisors instruct and oversee the crew of workers that carries out the work packages the Work Planners design. This requires the Supervisor to understand the work package, explain what needs to be accomplished to the workers, and choose the workers who

are best suited for each task. The Supervisor advises her team throughout the project. If an unanticipated problem arises, the Supervisor discusses the problem with a Work Planner. In these discussions, the Supervisors will often offer their opinion as to how best to remedy the concern. After completing a work package, the Supervisor is responsible for debriefing her work crew on their performance.

*Supply Analysts.* Three of the plaintiffs held the title of "Supply Analyst." Essentially buyers for the corporation, Supply Analysts locate replacement parts for needed repairs. Given the complexity of a nuclear power plant, this can be a difficult task. Frequently the proper part is no longer manufactured, requiring the Supply Analyst to search a computer database, vendor catalogs, and her own past experience to find a safe substitute that will meet ComEd's exacting standards. Supply Analysts often check each other's work in an attempt to ensure that they have found the optimum replacement.

*Staff Specialists*. The remaining three plaintiffs were classified as "Staff Specialists." Two worked in the Engineering Department, and one in the Chemistry Department. These Specialists focus on keeping the ComEd plants compliant with the Nuclear Regulatory Commission's guidelines. The Chemistry Specialist coordinates training for employees, tests machinery to check for possible equipment failures, and makes suggestions for improvements in the department's procedures and protocols. The Engineering Specialists do not coordinate training, but, apart from that task, their duties are substantively the same as those of the Chemistry Specialist. If the Specialists believe that they have discovered a problem, they consult a guidebook that explains the corrective procedures to follow. After consulting the guidebook, the Specialists draft a report detailing their concerns and recommending a solution.

## II

Under the FLSA, 29 U.S.C. § 201, *et seq.*, employers must pay overtime to employees working on an hourly basis. If such an employee works more than 40 hours in a week, she must receive at least one and a half times her regular wage for every extra hour worked. See 29 U.S.C. § 207(a)(1). Critically for our purposes, however, there is a significant exception to this rule: it does not apply to individuals "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The FLSA does not define "executive, administrative, or professional capacity"; instead, it expressly delegates that task to the Secretary of Labor who may "from time to time" alter the definitions. See 29 U.S.C. § 213(a)(1).

From "time to time" has proved to be fairly infrequent. A few days after oral argument in this case, the Secretary issued a comprehensive set of new regulations, see 69 Fed. Reg. 22,260 (April 23, 2004), but it had been some time since the last changes. The FLSA's duties test, which determines which jobs qualify for exempt status, had not been changed significantly since 1949. The Act's definitions for what it means to work on a "salary basis" had not changed since 1954, and the Department of Labor ("DOL") had last adjusted the minimum qualifying salary levels in 1975. Although the Secretary's interpretive hiatus ended while this appeal was pending, the new definitions do not apply retroactively, saving us from having to send the case back to the district court for new findings. See *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."). We therefore stick with the old regulations, which (like their new counterparts) have "the force and effect of law," as the statute expressly authorizes their promulgation. See *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977).

ComEd contends that each of the plaintiffs was exempt from receiving overtime because, properly characterized, they were all "administrative" employees. Under the old regulations, there was both a long test, see 29 C.F.R. § 541.2 (a)-(e) (2001), and a short test, see 29 C.F.R. § 541.214 (2001), to determine whether an employee fell within the administrative exception. Under the new regulations, there is just one test, see 29 C.F.R. § 541.200 (2004), but, as we noted, we must apply the old rules to this case. (Unless we note otherwise, citations to the regulations are to the 2001 version we are using here.) Both parties agree that we should use the short test, which applies to "high salaried administrative employees." 29 C.F.R. § 541.214. In part because the DOL had not amended this section since 1975, plaintiffs qualified as "high salaried" and therefore eligible for the short test, which required only that they be "compensated on a salary or fee basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities." *Id.*

It is the employer's burden to establish that an employee is exempt from the FLSA's overtime requirements. See *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). To satisfy this burden under the old short test, the employer has to demonstrate that the employee meets three conditions. See 29 C.F.R. § 541.214; *Piscione v. Ernst & Young*, 171 F.3d 527, 533 (7th Cir. 1999). First, the employer has to pay the employee on a salary basis, as defined in the regulations. *Piscione*, 171 F.3d at 533. Second, the primary duty of the employee must involve office or nonmanual work "directly related to management policies or general business operations." *Id.* Finally, the employee's job has to "include[ ] work requiring the exercise of discretion and independent judgment." *Id.* As the district court properly concluded, it is ComEd's burden on summary judgment to show that there is no genuine issue of material fact on each one of these points.

*Salary Basis.* Whether ComEd can show that it paid the plaintiffs on a salary basis depends on whether, under the plaintiffs' employment agreements, they "regularly receive[ ] each pay period . . . a predetermined amount constituting all or part of [their] compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a) (now codified under 29 C.F.R. § 541.602(a) (2004)). "If an employer docks an employee's pay for partial day absences, violations of rules other than those of safety, or based on the quantity or quality of the employee's work, the employee is not considered to be on a salary basis." *Piscione*, 171 F.3d at 534.

The plaintiffs, amalgamating the various job categories, make three arguments for why they are not employed on a "salary basis" even though they are identified as "salaried" on ComEd's payroll and receive salaried employee benefits. First, the plaintiffs contend that because ComEd tracked employee time and sometimes paid the plaintiffs *more* than their listed salaries, the resulting upward fluctuations must mean that they were hourly workers. Yet the old regulation stated plainly that "additional compensation besides the salary is not inconsistent with the salary basis of payment." See 29 C.F.R. § 541.118(b). As we have said before, "when the regulation's interpretations state that a salaried employee's pay 'is not subject to reduction because of variations in the quality or quantity of the work performed,' 29 C.F.R. § 541.118(a), a *reduction* of salary must have actually occurred for an employee to lose the exemption." *Klein v. Rush-Presbyterian-St. Luke's Med. Ctr.* 990 F.2d 279, 286 (7th Cir. 1993) (emphasis added). For obvious reasons, the DOL is concerned more with reductions in a salaried employee's wages that are correlated with the number of hours worked than it is with increases. See Wage-Hour Op. Ltr. No. 1738 (April 6, 1995) ("[E]xtra compensation may be paid for overtime to an exempt

employee on any basis. The overtime payment need not be at time and one-half, but may be at straight time, or at one-half time, or flat sum, or any other basis."). The situation would be different if the plaintiffs' salaries were so far below their actual compensation (calculated on an hourly basis) that the "salary" was "nothing more than an illusion," see *Mich. Ass'n of Gov't Employees v. Mich. Dept. of Corrs.*, 992 F.2d 82, 84 n.3 (6th Cir. 1993), but that is not the case here.

Second, the plaintiffs argue that they are not salaried employees because ComEd's "Snow Day Policy" subjects them to an impermissible reduction in pay. The plaintiffs' wages have never been decreased under this policy, but both the old and new regulations state that being "subject to" a reduction in pay is sufficient to prevent an employee from being considered "salaried." See 29 C.F.R. § 541.118(a) (2001); 29 C.F.R. § 541.602(a) (2004). The phrase "subject to" does not require proof that an employer has reduced an employee's wages; "an employment policy that creates a 'significant likelihood' of [a] deduction" will suffice. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); see also *Klein*, 990 F.2d at 286 ("'Subject to reduction' does not mean that a reduction was actually made. The plain meaning of the language suggests that it is enough that a deduction could have been made for an impermissible reason.").

ComEd's Snow Day Policy, as recounted in an informal email to ComEd managers and supervisors, states:

> [E]mployees who cannot get to work at all as a result of extremely hazardous conditions and roads made impassable by a heavy snowstorm will be given the option of either taking a vacation day or the day off without pay. Employees who do report to their regular work location for work during their basic day, but are late despite taking every precaution and making every effort to be on time, will be paid for the entire day.

While this email contemplates the possibility of an employee's choosing to take a day off without pay, it does not

state that ComEd will reduce a salaried employee's wages for failing to make it to work during a snowstorm. Being given the choice to make up the time lost is not the same as having a policy that imposes deductions for failing to show up. See *Haywood v. North Amer. Van Lines*, 121 F.3d 1066, 1070 (7th Cir. 1997). The record indicates that even if an employee had chosen to take the day off without pay, ComEd would not have reduced her salary. Instead, ComEd would have issued a check in the same amount as always, but would have reduced the employee's number of personal leave days by one. The FLSA does not prohibit this type of non-monetary deduction. See *id.* ("Nothing in the regulations suggests that an employee loses his exempt status simply because his employer disciplines him in a non-monetary fashion for failing to work during his scheduled time."). While the plaintiffs contend that the policy would require ComEd to reduce an employee's salary if she had already exhausted her personal leave days, the email does not dictate such a result. Given that ComEd has never reduced an employee's salary on this basis, we find this lone email, which does not spell out the feared result, insufficient to create a genuine issue of material fact that the policy subjected the plaintiffs to a reduction in salary.

Finally, the plaintiffs attempt to prove that they are not salaried by identifying a few instances where ComEd impermissibly docked small portions of three of the plaintiffs' wages. ComEd admits these improprieties, but argues that the deductions were inadvertent and that the affected workers have since been repaid. Through a "window of correction," the old regulations protected employers who intended to pay their employees on a salary basis, but who, inadvertently and infrequently, docked an otherwise salaried employee. See 29 C.F.R. § 541.118(a)(6) ("where a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer

reimburses the employee for such deductions and promises to comply in the future."); see also 29 C.F.R. § 541.603(c) (2004).

While "the plain language of the regulation sets out 'inadverten[ce]' and 'made for reasons other than lack of work' as *alternative* grounds permitting corrective action," see *Auer*, 519 U.S. at 463, the employer may take advantage of the regulation only if it objectively intended to pay its employees on a salary basis. See *Whetsel v. Network Prop. Servs., L.L.C.*, 246 F.3d 897, 901 (7th Cir. 2001). If the employees can show that the deductions were not merely happenstance, but a routine practice or company policy, the employer may not rely on the margin of error tolerated by the regulation. Here, the plaintiffs can identify only three affected individuals among them, none of whom lost more than the equivalent of a few hours of pay. There was no pattern to the deductions and they occurred over the equivalent of 470,000 work weeks. We note also that the instances cited in the plaintiffs' brief all occurred during the calendar year 2000, and most were around the time that Exelon was reorganizing its corporate operations. Identifying a few random, isolated, and negligible deductions is not enough to show an actual practice or policy of treating as hourly the theoretically salaried. Since ComEd has reimbursed the plaintiffs for these improper, but inadvertent, deductions, it may invoke the regulation's "window of correction." This means that these isolated instances of deductions do not create a genuine issue of fact about the proper characterization of the plaintiffs' positions.

*Primary Duty.* Next, ComEd has to show that the plaintiffs' duties "consist primarily of office or nonmanual work directly related to management policies or general business operations." *Haywood*, 121 F.3d at 1071; see also 29 C.F.R. § 541.205. Since both parties agree that the plaintiffs do office or nonmanual work, our only inquiry is whether there is any meaningful dispute about whether their primary

duties directly relate to ComEd's management policies or general business operations. See *id.* The old regulations provided that work "directly related to management policies or general business operations" includes activities "relating to the administrative operations of a business." 29 C.F.R. § 541.205(a). "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). "These interpretive regulations suggest a dichotomy between 'production' and 'administrative' jobs." *Shaw v. Prentice Hall Computer Pub., Inc.*, 151 F.3d 640, 644 (7th Cir. 1998). While every job context is different, "the typical example of the production/administrative dichotomy is a factory setting where the 'production' employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork." *Id.* Administrative tasks constitute an employee's primary duty if the tasks represent "the major part, or over 50 percent of the employee's time." 29 C.F.R. § 541.103. In order to evaluate this part of the plaintiffs' argument, we must consider each group of employees separately.

We look first at the 42 Work Planners. As we detailed before, these employees spend the majority of their day in an office, creating instructions for the maintenance and repair of ComEd's machines. The plaintiffs admit that the Planners do not turn the wrenches themselves, but they insist that Planners should nonetheless fall on the production side of the production/administrative line, both because of what they are doing and because of the number of people employed as Planners. We disagree. With respect to numbers, the regulations foreclose the plaintiffs' position: "[t]he fact that there are a number of other employees of the same employer carrying out assignments of the same rela-

tive importance or performing identical work does not affect the determination of whether they meet this test so long as the work of each employee is of substantial importance to the management or operation of the business." 29 C.F.R. § 541.205(a)(6). With respect to their duties, recall that the Planners are responsible for "planning" and "advising the management" about the best way to operate the plant when difficulties arise. In that sense, their task is a strategic one; as we noted earlier, they evaluate possible repairs, they inspect equipment, and they decide whether equipment may need to be modified.

The inspection work most obviously relates to planning, insofar as it is designed to spot trouble in advance and decide what steps to take. The role the Planners take in repairs and modifications is both to map out solutions to a particular problem and to advise on future actions. The mere fact that their advice and planning relates directly to plant operations is not enough to make them, personally, the actual production employees. As the regulations explain, the exemption "is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole." It includes those "whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." 29 C.F.R. § 541.205(c). Given the reality of the Planners' daily routine, we see no genuine issue of fact with respect to the "duties" portion of ComEd's burden with respect to this group.

The Lead Planners and the First Line Supervisors are part of the administrative operations of the business because their primary task is managing the work of others. They do no physical work, but rather guide other employees to make sure that work packages are implemented efficiently and tasks are completed on time. Lead Planners and Supervisors fall on the administrative side of the administration/ production line because managing others is, by

definition, "of substantial importance to the management . . . of a business." 29 C.F.R. § 541.205(c)(1).

The conclusion that the three Supply Analysts, whose primary job is to locate replacement equipment for ComEd, are part of the company's administration is straightforward. The regulations expressly classify such workers as administrative, stating, "[a]nother example of an employee whose work may be important to the welfare of the business is a buyer of a particular article or equipment in an industrial plant." 29 C.F.R. § 541.205(c)(4). While the Supply Analysts do not sign the checks, they determine what part is needed and inform others in the administration what ComEd needs to purchase. The regulation classifies such jobs within the administrative side of a company.

The record also establishes that ComEd's Staff Specialists can only be classified as administrative. These employees ensure that ComEd complies with the requisite federal guidelines by collecting data, conducting tests, and organizing employee training. The regulations characterize duties like these as administrative:

> In the data processing field some firms employ persons described as systems analysts and computer programmers. If such employees are concerned with the planning, scheduling, and coordination of activities which are required to develop systems for processing data to obtain solution to complex business, scientific, or engineering problems of his employer or his employer's customers, he is clearly doing work directly related to management policies or general business operations.

29 C.F.R. § 541.205(c)(7). Although the regulation refers to the "data processing field", "the interpretive regulations are to be used to the extent they are helpful analogies to the case at hand." *Prentice Hall*, 151 F.3d at 644. Here, the Specialists "are concerned with the planning, scheduling,

and coordination of activities" necessary to discover and rectify any compliance problems ComEd may have. These tasks are sufficiently analogous to the regulation's characterization of "Systems Analysts" to find the Specialists' tasks "directly related to management policies or general business operations."

We agree with the district court, in summary, that the undisputed facts about the jobs each group of plaintiffs performed show that their duties meet this part of the administrative exemption test.

*Discretion and Independent Judgment.* Last, ComEd must show that the undisputed facts demonstrate that the plaintiffs' duties involve the exercise of discretion and independent judgment. This determination requires "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. . . . [It] implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207. "While the regulations require the employee to exercise independent judgment, the term does not require this judgment to be made in isolation." *Piscione*, 171 F.3d at 535 (emphasis removed). The fact that others may review or even reverse an employee's judgment does not mean necessarily that the employee will fall outside the FLSA's administrative exemption. *Id.*

The plaintiffs make the general argument that because a nuclear power plant is an exceedingly regulated workplace—as they put it, "procedure driven, routine, and strictly controlled"—there was no room for any of the plaintiffs to exercise independent judgment. We disagree. Taken to its logical limit, such a blanket rule would prevent any employee at ComEd from falling under the exemption. Moreover, "[j]ust because an employee may spend a signi-

ficant portion of his time engaged in ministerial or routine tasks does not necessarily prevent the application of the administrative exemption." *Id.* at 539. While the plaintiffs' discretion may be channeled by the regulations that apply to this industry, that does not mean ComEd employees do not exercise independent judgment. Certainly no one would contend that a tax lawyer does not exercise discretion or independent judgment just because the Internal Revenue Code contains a highly regimented set of rules.

The plaintiffs' job-specific arguments fare no better. As problem solvers, the Work Planners and Lead Work Planners exercise discretion and independent judgment with respect to matters of significance. Their job is to come up with a set of instructions that will remedy reported problems around the plant. The fact that they look to past work packages for guidance and use a computer to aid their recommendations does not transform them into automatons. Judges, to name just one profession, routinely look to past decisions to determine how to resolve cases. Faced with novel or not-so-novel problems, judges and Work Planners must use their independent judgment to determine how best to respond. The fact that a chosen action might be overruled by a supervisor says nothing about the discretion and judgment that went into its selection in the first place. See also 29 C.F.R. § 541.207(e) ("The term 'discretion and independent judgment' as used in the regulations . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review.").

Lead Work Planners and First Line Supervisors are in routine contact with upper management, making recommendations about projects, schedules, and personnel. This input requires the use of independent judgment and discretion, as is typical for supervisory roles like these. See *Piscione*, 171 F.3d at 537 (finding the plaintiff exercised discretion because he had a number of supervisory responsibilities such

as "set[ting] the priorities for the other members of his team [and ] . . . judg[ing] the abilities of his junior employees"). One of the primary tasks of the Lead Work Planners and the First Line Supervisors is to assess the members of their team and decide which worker can complete a task most efficiently. These are matters of consequence that require the exercise of discretion and independent judgment.

If finding the right replacement part for a broken-down piece of equipment involved nothing more than calling the hardware store and having some standardized screws delivered, this case would be different. But the record reveals that the job of a Supply Analyst for ComEd is far more demanding. The parts that the Supply Analysts must purchase are often no longer manufactured. The Analysts must use their judgment to find a safe, compatible alternative that will meet the exacting specifications imposed by ComEd and the governing regulations. This is not an easy task and we conclude that it satisfies the final component of the administrative exemption.

We reach the same conclusion with respect to the Chemistry and Engineering Staff Specialists, who (as noted earlier) are responsible for keeping ComEd compliant with the Nuclear Regulatory Commission's guidelines. They conduct various tests and help train the employees in their respective departments. When they find a problem, they propose an appropriate remedy—a responsibility that makes their jobs somewhat similar to that of the Work Planners. Like the Planners, the Staff Specialists exercise independent judgment and discretion by comparing and evaluating several possible courses of action. The Specialists' recommendations keep ComEd in line with the applicable regulations, a role of unquestionable importance to ComEd and public safety.

### III

   Having reviewed the plaintiffs' jobs under the FLSA's short test, in light of the summary judgment record, we conclude that ComEd has shown that the plaintiffs were properly classified as exempt from the FLSA's overtime requirement. Since the plaintiffs' FLSA claims fail, their related state law claims under the IMWL must fail as well. See 820 ILCS 105/4a(2)(E) (making a violation of the IMWL contingent on establishing a violation under the FLSA). Accordingly, we AFFIRM the judgment of the district court.


A true Copy:

        Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*