In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3195

PAULA M. ROE-MIDGETT, Individually
and as Collective Action and
Class Action Representative, and
PAUL DECKER, Individually and
as Collective Action and
Class Action Representative,

*Plaintiffs-Appellants,*

*v.*

CC SERVICES, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 04 C 4051—**David R. Herndon**, *Chief Judge.*

ARGUED JANUARY 5, 2007—DECIDED JANUARY 4, 2008

Before FLAUM, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Plaintiffs Paula Roe-Midgett
and Paul Decker sued their employer CC Services, Inc.
("CCS") for overtime wages under the Fair Labor Stan-
dards Act ("FLSA"), 29 U.S.C. § 207(a)(1). CCS contracts
with insurance companies to provide claims processing
services for auto, home, commercial, and farm policies.
Roe-Midgett and Decker were employed as claims ad-
justers at different levels of CCS's claims-processing

hierarchy. Suing individually and on behalf of four classes of claims adjusters, the plaintiffs contended that CCS improperly classified them as administrative employees exempt from FLSA overtime requirements under 29 U.S.C. § 213(a)(1).

Applying the Department of Labor's so-called "short test" for determining whether employees fall within the FLSA's administrative exemption, the district court concluded that the primary duties of all four claims-processing positions involved matters (1) "directly related to management policies or general business operations" and (2) "requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.214 (2003). Accordingly, the court held the employees were exempt from the overtime pay requirements of the FLSA and granted summary judgment for CCS.

On appeal the plaintiffs develop no substantive challenge to the district court's ruling as it relates to three of the four classes of employees: CCS's Field Claims Representative II, Field Claims Representative III, and Property Specialist positions. As to these employees, they argue only that material issues of fact preclude summary judgment for CCS. But they failed to identify any real factual dispute specific to these employees. Regarding the final group of employees—those occupying the position of Material Damage Appraiser II—the plaintiffs contend that the duties of this position do not directly relate to CCS's management policies or general business operations and do not require the exercise of discretion and independent judgment. We disagree.

Material Damage Appraisers provide claims adjustment services for CCS's insurance company clients up to a $12,000 limit of claims settlement authority and represent the "face" of CCS to the countless claimants with whom they interact. They spend much of their time in the

field without direct supervision. They conduct on-site investigations of first- and third-party automobile insurance claims; interview claimants, witnesses, and law enforcement personnel; estimate loss; determine whether parts should be repaired or replaced; negotiate with mechanics and body shops and draft final repair estimates; and settle claims up to the limit of their $12,000 settlement authority. These duties directly relate to CCS's business operations and reflect a sufficient degree of discretion and independent judgment to qualify for the FLSA's administrative exemption. Summary judgment was properly entered for CCS on all four classes of employees.

## I. Background

CCS is engaged in the business of processing insurance claims for auto, home, commercial, and farm insurers. Headquartered in Bloomington, Illinois, and administered through 37 field offices, CCS's Claims Division settled roughly $600 million in claims in 2004. The claims-processing staff in each field office typically consists of Property Specialists, Field Claims Representatives, and Material Damage Appraisers ("MDA"), as well as other positions not relevant here.

MDAs draw an annual salary of $36,952 to $55,427 and primarily handle automobile claims. They do not make coverage or liability determinations, which are typically made by Field Claims Representatives or other claims agents. MDAs are responsible for investigating auto accident damage, making repair or replacement determinations, drafting estimates, and settling claims of up to $12,000 where liability has been established and coverage

approved.[1] MDAs spend much of their time in the field without direct supervision. Moreover, because 70% of appraisals assigned to MDAs come from the home office and not the local field office, the field office supervisors do not exert much direct daily control over MDAs.

Investigating accident damage entails a physical inspection of the vehicle to ensure the actual damage and its cause correspond to the claimed damage and cause. The cause of the accident often dictates the applicable policy (i.e., comprehensive or collision) and deductible. MDAs may also interview claimants, witnesses, and where relevant, police personnel. If an MDA notes inconsistencies or otherwise suspects fraud, he relays his observations to a CCS superior in charge of final liability and coverage determinations.

After documenting and investigating vehicle damage on a given claim, the MDA prepares an estimate. The first step in this process is determining if the vehicle is irreparably damaged (a "structural total loss" in industry parlance) or if the cost of repair exceeds the vehicle's value (an "economic total loss"). The latter calculation is performed by inputting the vehicle's identification number and damage estimate into a software program that "red flags" potential economic losses. If an MDA suspects a structural total loss, he will relay that suspicion along with photos of the damage to a claims representative with final say as to whether the vehicle is a structural total loss.

If the vehicle is not a total loss, the MDA must decide which parts to repair and which to replace. For repaired

---

[1] The average MDA payout on auto damage claims is far less than the $12,000 limit. From January to November 2002, for example, the average monthly payout ranged from $1750 to $2400.

parts, the MDA estimates the total labor costs based in part on his estimation of the man hours needed to complete the repair. In some instances body shops disagree with the MDA's projection, and the MDA negotiates for an adjusted hours estimate. MDAs might also adjust a repair estimate to account for "betterment," a concept intended to reflect the fact that parts that were in good repair cost more to restore to their original preaccident condition than parts already in disrepair at the time of the accident.

MDAs also estimate the cost of replacing any parts they deem beyond repair. They input a description of the part into a software program, which then generates an estimate based on labor costs and part price. In estimating the price for the part, the software detects the availability of used parts and automatically factors in that discount. The MDA may override the software and allow for new parts, but only after documenting the reasons for his deviation on a file summary sheet; all other deviations from CCS's adjusting guidelines must similarly be memorialized. "Betterment" adjustments may also affect replacement part estimates.

After projecting the repair and replacement costs, MDAs draft a final damage estimate. While they are responsible for explaining the estimate to the claimant and answering any questions, MDAs refer dissatisfied claimants to a CCS adjuster with authority to determine coverage and liability. If, however, the claimant is satisfied with the estimate and the claims representative has already determined liability, MDAs may settle claims of up to their $12,000 limit of authority. Claims representatives need not formally approve the actual amount of settlement or underlying estimate, though they informally review an MDA's work for errors. CCS auditors also periodically audit MDA estimates to ensure compliance with the adjusting guidelines and to gauge each MDA's

"leakage," that is, the percentage of total claims paid in error.

In addition to MDAs, CCS's field offices are also staffed with Field Claims Representatives II and III and Property Specialists. Employees with these titles generally receive a higher salary than MDAs and are authorized to make final coverage and liability determinations and settle higher-value and more complicated claims. For reasons we will explain, further discussion of the day-to-day duties of these positions is unnecessary for purposes of this appeal.

CCS classified its MDAs, Field Claims Representatives, and Property Specialists as "administrative" employees exempt from overtime wages otherwise mandated by the FLSA. Two CCS employees[2] took issue with the classification and brought this "opt-in" collective action under the FLSA. *See* 29 U.S.C. § 216(b). CCS moved for summary judgment with respect to all four positions; the plaintiffs cross-moved for summary judgment as to the MDA position. The district court granted CCS's motion and the plaintiffs appealed.

## II. Analysis

We review de novo the district court's grant of summary judgment in favor of CCS. *Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003). We will affirm if, construing the evidence and all reasonable inferences in a light most favorable to the plaintiffs, there are no genuine issues of material fact in dispute and CCS is entitled to judgment as a matter of law. *Id.*; FED. R. CIV. P.

---

[2] Roe-Midgett was an MDA; Decker was a Field Claims Representative and Property Specialist.

56(c). The burden is on CCS to establish that an employee falls within the FLSA's administrative exemption. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). Determining the duties encompassed by an employee's position is a question of fact; determining the appropriate FLSA classification is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

The FLSA requires employers to pay overtime wages (i.e., one and one-half times the regular rate) for any hours worked in excess of 40 per week. 29 U.S.C. § 207(a)(1) (2000). Exempt from the overtime requirements, however, are workers "employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). Congress has charged the Secretary of Labor with issuing regulations defining and delimiting the term "bona fide administrative capacity." *Id.* In 1975 the Secretary issued the so-called "short test" for determining whether salaried employees engaged in nonmanual work (a description the plaintiffs concede applies to them) are employed in an administrative capacity. 29 C.F.R. § 541.214 (2003) (all regulatory citations will be to the 2003 *Code of Federal Regulations* unless otherwise noted). At the heart of this appeal are the short test's two "duties" requirements, that is, that the employee's primary duties must (1) directly relate "to management policies or general business operations of the employer or the employer's customers" and (2) "include[ ] work requiring the exercise of discretion and independent judgment." *Id.*; *Demos v. City of Indianapolis*, 302 F.3d 698, 701 (7th Cir. 2002). An employee's title is not controlling; courts instead must engage in a case-by-case analysis of the employee's duties and responsibilities. 29 C.F.R. § 541.201(b)(1).

In 2004 the Secretary issued a comprehensive set of new regulations addressing the scope of the overtime

exemptions. 69 Fed. Reg. 22122, 22260 (Apr. 23, 2004) (codified at 29 C.F.R. § 541.200). The regulations replaced the short test and the longer test at section 541.2(a)-(e) with a "general rule" for determining whether an employee works in an administrative capacity. *Id.* at 22139. The general rule, however, merely restates the short test's two "duties" requirements. *Id.*; 29 C.F.R. § 541.200(a)(2)-(3) (2006). Indeed, the only differences between the short test and the new "general rule" are the salary requirement (at least $250 per week under the old rule versus $455 per week under the new rule) and the additional explanation that an administrative employee must exercise discretion or independent judgment "with respect to matters of significance." 29 C.F.R. § 541.200(a)(1), (3) (2006). While that qualifying phrase was not explicitly part of the old test, it was built into the old rule's definition of "discretion and independent judgment" found elsewhere in the applicable regulations. *See* 69 Fed. Reg at 22143. In other words, the new "general rule" is essentially a simplified restatement of the old "short test."

The 2004 regulations also list examples of jobs that generally satisfy the "duties requirements" for administrative employees. 29 C.F.R. § 541.203 (2006). Included in that list are "insurance claims adjusters . . . , if their duties include activities such as interviewing insureds, witnesses, and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation." *Id.* § 541.203(a).

Because the 2004 regulations took effect after the plaintiffs brought this action, the old short test still determines whether they fall within the administrative

exemption. *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005) (explaining that the 2004 regulations do not apply retroactively). But the new regulations are nonetheless informative on the issues before us in this appeal. The Secretary of Labor has characterized the promulgation of the new rules as an effort to "consolidate and streamline" the dense and unwieldy regulatory text of the old regulations. 69 Fed. Reg. at 22126. As we have noted, the 2004 regulations did not substantively alter the old short test; to the contrary, the Secretary undertook the regulatory revision to "streamline[ ] the existing regulations by adopting a single standard duties test for each exemption category, rather than the existing 'long' and 'short' duties test[ ] structure." *Id.* The Secretary also described section 541.203, which lists examples of jobs that would be deemed "administrative" and therefore exempt from overtime pay, as "consistent with" the old regulations and case law. *Id.* at 22144; *see also In re Farmers Ins. Exch.*, 481 F.3d 1119, 1128 (9th Cir. 2007) ("[Section] 541.203 does not represent a change in the law."); *Robinson-Smith v. GEICO*, 323 F. Supp. 2d 12, 26 (D.D.C. 2004) (same).

## A. The MDA Position

### 1. The "Directly Related" Requirement

For MDAs to fall within the administrative exemption, CCS must first establish that their primary duties consist of "work directly related to management policies or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.214. This requirement encompasses "those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work." *Id.* § 541.205(a). "The administra-

tive operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." *Id.* § 541.205(b). The "directly related" requirement also "limits the [administrative] exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." *Id.* § 541.205(a). Accordingly, the "directly related" component of the short test requires that the employee's duties: (1) involve the administrative operations of the business, as distinct from production or sales work; and (2) be "of substantial importance" to the business or its customers.

CCS is in the business of processing claims brought by policyholders and other claimants against the insurance policies of its insurance company clients. MDAs handle 60% of all claims processed by CCS. A large percentage of those claims involve auto damage totaling less than $10,000, which MDAs investigate, adjust, and settle with only minimal oversight. In so doing, MDAs are required to analyze "data and draw[ ] conclusions which are important to the determination of . . . [CCS's] policy." 29 C.F.R. § 541.205(c)(3). Consequently, MDAs play a significant role in the claims-adjusting service CCS provides to its insurance-carrier clients. MDAs are at the front lines of CCS's auto claims adjusting operation; they spend most of their time in the field and represent the "face" of CCS to the claimants and mechanics with whom they interact. *See id.* § 541.205(b). Investigating, estimating, and ultimately settling auto damage claims is obviously "work of substantial importance" to CCS's business operations and is the core service it provides to

its customers.[3] *Id.* § 541.205(a). Indeed, the plaintiffs have not mounted a serious challenge to CCS's claim that an MDA's duties are of "substantial importance" to its business. As such, they have essentially conceded the point. *See United States v. Duran*, 407 F.3d 828, 844 n.7 (7th Cir. 2005).

The plaintiffs do argue, however, that the duties of an MDA are not properly characterized as "administrative" for purposes of the first aspect of the "directly related" requirement. They contend MDAs are the post-industrial equivalent of production workers and thus are not involved in CCS's administrative operations. The plaintiffs are correct that the "directly related" test seeks to distinguish exempt administrative work from nonexempt production or sales work. 29 C.F.R. § 205(a); *Kennedy*, 410 F.3d at 372. But their attempt to cast MDAs as service-industry "production" workers founders for two reasons.

First, the plaintiffs make too much of the fact that CCS does not actually underwrite or sell insurance policies. The gist of the plaintiffs' argument is that CCS "produces" claims-processing services (though not the underlying policies) and therefore MDAs are essentially responsible for "producing" CCS's "product." This argument hinges on a distinction between in-house claims processing by insurance companies, which the plaintiffs view as ancil-

---

[3] This is not to say all white-collar employees in service industries necessarily perform "work of substantial importance" sufficient to meet the "directly related" test. The regulations make clear that "bookkeepers, secretaries, and clerks of various kinds" do not generally perform such work because "routine clerical work" is not of substantial importance to the employer's business operations. 29 C.F.R. § 541.205(c)(1). But MDAs perform more than routine clerical work; they make substantive decisions regarding the claims insurance companies pay CCS to process.

lary to the "production" of the policies themselves, and outsourced claims processing of the type performed by CCS, which they interpret as a "product" unto itself. Under the Department of Labor's interpretive regulations, however, this distinction is immaterial, as "administrative operations of a business" may "be those of the employer *or* the employer's customers." *See* 29 C.F.R. § 541.205(a), (d) (emphasis added). CCS's customers are insurance companies in the business of selling policies, and employees who process claims against those policies are performing an administrative function for CCS's customers (i.e., a task that administers the policies "produced" by the insurers).

This conclusion is reinforced by a Department of Labor opinion letter involving a "claims specialist" who processed claims "on behalf of a contracting insurance company." DOL Wage & Hour Div. Op. Ltr. FLSA2005-25, at 4 (Aug. 26, 2005). The administrative exemption turns on how employees spend their day, not who signs their paycheck. *See* 29 C.F.R. § 531.205(d). It would be strange to conclude that a claims-processing employee at a third-party service company like CCS is entitled to overtime while his in-house counterpart at XYZ Insurance Co. is not. Indeed, the 2004 regulations make it clear that "insurance claims adjusters generally meet the duties requirements for the administrative exemption, *whether they work for an insurance company or other type of company*." 29 C.F.R. § 541.203(a) (2006) (emphasis added).

Second, the so-called production/administrative dichotomy—a concept that has an industrial age genesis—is only useful by analogy in the modern service-industry context. "The typical example of the . . . dichotomy is a factory setting where the 'production' employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork." *Shaw v. Prentice Hall Computer Publ'g, Inc.*, 151 F.3d 640, 644 (7th Cir. 1998). The analogy is not

terribly useful here, particularly given that the 2004 regulations suggest a more traditional meaning of "production." The new regulations state that the "directly related" test is met by employees who "assist[ ] with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a) (2006). MDAs are obviously neither working on a manufacturing line nor "producing" anything in the literal sense. They are service providers, and the service they provide is the administration of insurance claims. This is the main business of CCS's Claims Division. *See* DOL Wage & Hour Div. Op. Ltr. FLSA2005-25, at 4; *see also Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir. 1997) (employee who settled customer complaints against moving company meets "directly related" test because her employment activity was ancillary to the employer's moving business). We have no difficulty concluding that the duties of MDAs "directly relate" to CCS's "administrative operations."

This conclusion is supported by an interpretive regulation that lists "claim agents and adjusters" as examples of positions that will generally satisfy the "directly related" part of the short test. *See* 29 C.F.R. § 541.205(c)(5). MDAs may lack some of the responsibilities traditionally associated with claims adjusting—they do not, for example, make liability and coverage determinations, *see id.* § 541.203(a) (2006)—but inspecting, appraising, and settling property damage claims are core adjuster functions. *See id.*

## 2. The "Discretion and Independent Judgment" Requirement

The undisputed evidence also leads us to conclude that MDAs satisfy the short test's second requirement—the

"exercise of discretion and independent judgment." 29 C.F.R. § 541.214(a). The old regulations devote pages to defining this phrase. They first explain that it involves "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." *Id.* § 541.207(a). The phrase also "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id.* That choice need not be final or otherwise immune from review; an exercise of discretion or independent judgment may "consist of recommendations for action rather than the actual taking of action." *Id.* § 541.207(e). The regulations also caution against confusing true discretion and independent judgment with the "use of skill in applying techniques, procedures, or specific standards." *Id.* § 541.207(b)-(c)(7). Employees who fit the latter description, whom the regulations describe as workers who grade, classify, or otherwise determine whether specified standards are met, are not exercising discretion or independent judgment for purposes of the administrative exemption. *Id.* § 541.207(c)(1)-(2). The plaintiffs argue that this description applies to MDAs, whom they characterize as mere "fact finders" whose responsibilities involve only "the most basic component of the claims adjusting process."

Though the old regulations are silent as to whether employees who adjust insurance claims exercise discretion and independent judgment, the Department of Labor (through agency opinion letters) and the circuits that have confronted the question generally regard "claims adjusters" as exercising sufficient discretion to trigger the administrative exemption. DOL Wage & Hour Div. Op. Ltr. FLSA2002-11, at 2 (Nov. 19, 2002) ("Wage and Hour has long recognized that claims adjusters typically perform work that is administrative in nature."); *see In*

*re Farmers*, 481 F.3d at 1119; *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585-86 (5th Cir. 2006); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003). Codifying the Department's position, the new regulations explain that "insurance claims adjusters generally meet the duties requirements for the administrative exemption." 29 C.F.R. § 541.203(a) (2006). Unlike the claims adjusters in the opinion letters and cases we have cited, however, MDAs do not themselves determine coverage or liability. They also do not negotiate with the claimant's attorney or make litigation recommendations. *See id.* We conclude these distinctions are not significant enough to take the MDAs outside the scope of the administrative exemption.

In addition to performing the core duties of a claims adjuster, MDAs routinely use their discretion and independent judgment to make choices that impact damage estimates, settlement, and other "matters of significance." 29 C.F.R. § 541.207(a). When MDAs inspect a vehicle for damage, they must exercise independent judgment to verify whether the actual damage is consistent with the claimed damage. In doing so, the MDA must evaluate whether the damage is likely preexisting, inconsistent with the alleged cause, or otherwise suspicious. The MDA must also be on the lookout for fraud when interviewing the claimant and any witnesses. These are judgment calls with respect to matters of significance; MDAs are using their knowledge and experience to distinguish covered damage from fraudulent or preexisting damage. While MDAs do not make final liability decisions, their assessment of the damage and its cause bear directly on the ultimate coverage determination.

For example, at her deposition Roe-Midgett testified that if she noticed damage indicative of a collision with a deer as opposed to another vehicle, she would "let the adjuster . . . know that they may need to look into it

a littler further" because "there's a coverage difference."
Roe-Midgett acknowledged that deer-vehicle collisions
would be covered by the claimant's "comprehensive" rather
than "collision" policy, which may carry different de-
ductibles. She also explained that if she felt certain
damage was preexisting, she would "let the file handler
know that this damage is not part of this claim" because
"we don't pay for claims we do not owe." In other words,
MDAs like Roe-Midgett make coverage recommenda-
tions to their superiors. The applicable regulations
explain that "decisions made as a result of the exercise of
discretion and independent judgment may consist of
recommendations for action rather than the actual tak-
ing of action." 29 C.F.R. § 541.207(e)(1).

The balance of an MDA's day-to-day responsibilities
mirror the duties the new regulations attribute to ex-
empt "claims adjusters," namely: "interviewing insureds
[and] witnesses . . . ; inspecting property damage; re-
viewing factual information to prepare damage esti-
mates; evaluating and making recommendations re-
garding coverage of claims; [and] determining . . . [the]
total value of a claim." 29 C.F.R. § 541.203(a) (2006).
That MDAs are not engaged in determining liability and
making recommendations regarding litigation does not
mean they are not "claims adjusters" as defined in the
regulations. The Secretary of Labor has explained that
section 541.203 "identifies the *typical* duties of an exempt
claims adjuster." 69 Fed. Reg. at 22144 (emphasis added).
As such, the regulation "does not require the adjuster
to perform each and every activity listed." *In re Farmers*,
481 F.3d at 1129.

We recognize section 541.203(a) is not meant to confer
a "blanket exemption for claims adjusters." DOL Wage &
Hour Div. Op. Ltr. FLSA2005-2, at 2 (Jan. 7, 2005). We
are required to conduct "a case-by-case assessment to
determine whether the employee's duties meet the require-

ment for exemption." 69 Fed. Reg. at 22144. Because the undisputed evidence here establishes that MDAs spend most of their time in the field investigating, estimating, and settling auto damage claims—unsupervised and up to their $12,000 limit of authority—we conclude that their duties involve the exercise of sufficient discretion and independent judgment to come within the scope of the administrative exemption.

The plaintiffs counter that MDAs are so constrained by CCS's adjusting manual and estimating software that there is no room for independent judgment. But independent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines. *Kennedy*, 410 F.3d at 374-75; *Cheatham*, 465 F.3d at 585. Moreover, MDAs have the leeway to deviate from the adjusting manual provided they document their reasons for doing so, authority that itself connotes discretion and independent judgment. Moreover, the use of computer software does not itself imply a lack of independent judgment or discretion. *Kennedy,* 410 F.3d at 375; *In re Farmers*, 481 F.3d at 1130; *Cheatham*, 465 F.3d at 585. While MDAs use a software program to guide their preliminary estimates, they do not use a computer to (1) detect possible fraud or damage inconsistent with the claim; (2) communicate with body shops to obtain part and labor costs below those generated by the software; (3) determine whether and what parts to repair instead of replace; (4) explain the estimate to the claimant; or (5) settle a claim within their prescribed settlement authority. As with the adjusting manual, MDAs may override the estimating software in certain instances. The adjusting manual and the estimating software are most accurately characterized as tools that channel rather than eliminate the MDAs' discretion. *See Kennedy*, 410 F.3d at 374.

The plaintiffs further contend that MDAs simply draw on their skill and experience in inspecting damage and

estimating repair costs. They are correct to the extent that "appraisers who merely inspect damaged vehicles to estimate [repair costs] . . . are guided primarily by their skill and experience" and thus are not exercising discretion and independent judgment. *In re Farmers*, 481 F.3d at 1128 (quoting DOL Wage & Hour Div. Op. Ltr., at 1-2 (Feb. 18, 1963)); *see also* 29 C.F.R. § 541.207(c)(1); DOL Wage & Hour Div. Op. Ltr. FLSA2005-2, at 2-3 (opining that "junior-level claims adjusters" who primarily conduct scripted interviews over the telephone apply their skills and knowledge rather than exercise their discretion and independent judgment). But the MDAs do far more than just appraise damage. They also investigate the claim, check for fraud, decide whether to repair or replace parts, negotiate with body shops, and settle claims up to $12,000. MDAs thus are not mere appraisers; appraising damage is included among many duties MDAs perform in the course of adjusting auto damage claims.

We could find no appellate cases or opinion letters in which a claims-processing employee with similar responsibilities to the MDA's was found to be nonexempt. All the appellate cases involving claims-processing employees have arrived at the same conclusion we have reached here. *See In re Farmers*, 481 F.3d at 1132 (addressing "automobile damage adjusters"); *Cheatham*, 465 F.3d at 585-86 (addressing "adjusters who handled liability claims for bodily injury and damage to property"); *McAllister,* 325 F.3d at 998, 1001 (addressing a "claims coordinator"). So have a number of district court cases. *See, e.g., Jastremski v. Safeco Ins. Co.*, 243 F. Supp. 2d 743, 746, 758 (N.D. Ohio 2003) (addressing a "senior claims representative"); *Palacio v. Progressive Ins. Co.*, 244 F. Supp. 2d 1040, 1049 (C.D. Cal. 2002) (addressing a "claims representative").

The plaintiffs cite only three district court cases in support of their argument that MDAs do not exercise discretion and independent judgment. The first, *In re Farmers*, 336 F. Supp. 2d. 1077 (D. Or. 2004), was overruled on appeal, 481 F.3d 1119. The second relied on the overruled *In re Farmers* decision to such an extent that it too is unpersuasive. *Robinson-Smith,* 323 F. Supp. 2d at 25 n.7 ("[T]he Court finds the reasoning of . . . [*In re Farmers*] to be persuasive."). The third case, *Reich v. American International Adjustment Company*, involved "auto damage appraisers" who had no settlement authority and whose sole responsibility was to "determine the cost of repair." 902 F. Supp. 321, 324 (D. Conn. 1994). In contrast, MDAs have settlement authority up to $12,000, and the record establishes that they routinely exercise this authority. The average payout is relatively small (Roe-Midgett's average payout was $1724 per claim from January through November 2002), but "nothing in the regulation suggests that 'smaller claims' . . . should be treated differently." *In re Farmers*, 481 F.3d at 1133. In sum, the district court properly concluded the MDAs were exempt administrative employees.

## II. The Field Claims Representative and Property Specialist Positions

The plaintiffs' only argument on appeal regarding the Field Claims Representative and Property Specialist positions is that triable issues of fact preclude summary judgment for CCS. However, they identify no issues of material fact specific to either of these positions. At oral argument we asked plaintiffs' counsel for an example of a factual dispute involving either position. Counsel cited the fact that CCS's adjusting manual and estimating software significantly limited the degree of discretion and judgment exercised by these employees. This is not a

factual dispute. There is no disagreement about whether CCS's adjusting manual and estimating software govern the claims adjustment process; they do. The parties' dispute is about the legal consequences of that undisputed fact: that is, whether the manual and software so limit the employees' discretion as to make the administrative exemption inapplicable. *See Worthington*, 475 U.S. at 714 ("The question of how the respondents spent their [time at work] is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . .").

We have already determined that the manual and software do not eliminate the discretion and judgment exercised by an MDA; the plaintiffs have not offered any additional argument specific to the Field Claims Representative or Property Specialist positions. Accordingly, the plaintiffs have failed to develop a meaningful challenge to the district court's order granting summary judgment to CCS with respect to these two positions. *See Smith v. Ne. Ill. Univ.,* 388 F.3d 559, 569 (7th Cir. 2004) (undeveloped argument constitutes waiver).

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—1-4-08